# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**Misc. Dkt. No. 2017-11**

————————————

**Bryant H. PRESTON**
Technical Sergeant (E-6), U.S. Air Force, *Petitioner*

**v.**

**UNITED STATES**
*Respondent*

————————————

Review of Petition for New Trial Pursuant to Article 73, UCMJ

Decided 31 May 2018

————————————

*Military Judge:* L. Martin Powell.

*Approved sentence:* Dishonorable discharge, confinement for 2 years, and reduction to E-1. Sentence adjudged 19 November 2015 by GCM convened at Luke Air Force Base, Arizona.

*For Petitioner:* Major Johnathan D. Legg, USAF; Major Todd M. Swensen, USAF.

*For Respondent:* Lieutenant Colonel G. Matt Osborn, USAF; Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, JOHNSON, and KIEFER, *Appellate Military Judges.*

Senior Judge JOHNSON delivered the opinion of the court, in which Chief Judge MAYBERRY and Judge KIEFER joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

JOHNSON, Senior Judge:

A general court-martial composed of officer members convicted Petitioner, contrary to his pleas, of one specification of attempted sexual assault of a child under the age of 16 years and one specification of attempted sexual abuse of a child under the age of 16 years on divers occasions, in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880. The court-martial sentenced Petitioner to a dishonorable discharge, confinement for two years, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.[1]

This court affirmed the findings and sentence on 31 August 2017. *United States v. Preston*, 2017 CCA LEXIS 596 (A.F. Ct. Crim. App. 31 Aug. 2017) (unpub. op.). Petitioner timely filed a motion for reconsideration and a petition for new trial, both on 29 September 2017. On 24 October 2017, this court denied Petitioner's motion for reconsideration. On 22 December 2017, Petitioner filed a petition for grant of review with the United States Court of Appeals for the Armed Forces (CAAF). Having denied the motion for reconsideration and noting Petitioner's petition for grant of review by the CAAF, on 5 January 2018 we concluded that this court had been divested of jurisdiction over the petition for new trial and returned that petition to The Judge Advocate General (TJAG) for disposition in accordance with Article 73, UCMJ, 10 U.S.C. § 873.

On 6 March 2018, the CAAF vacated our ruling on the motion for reconsideration and returned the record of trial to TJAG for remand to this court "for submission of the petition for new trial to [this] court." *United States v. Preston*, 2018 CAAF LEXIS 125, at *1 (C.A.A.F. 2018). Accordingly, we now address Petitioner's petition for new trial. Finding no such relief is warranted, we deny the petition.

## I. BACKGROUND

Petitioner was stationed at Luke Air Force Base (AFB), Arizona. In January 2015, he attended Noncommissioned Officer Academy at Sheppard AFB, Texas. While there, Petitioner visited a Craigslist personals webpage and responded to an advertisement titled "Dependent Looking for Company." The message had been posted by Special Agent (SA) TK, an agent of the Air Force Office of Special Investigations (AFOSI) assigned to an internet crimes task force in northern Virginia.

---

[1] The convening authority approved Petitioner's request to defer the reduction in grade and automatic forfeiture of pay and allowances pursuant to Articles 57(a) and 58b, UCMJ, 10 U.S.C. §§ 857(a), 858b.

Petitioner began a series of electronic communications with "Tina," the fictional persona adopted by SA TK. In the initial reply to Petitioner's response, "Tina" informed Petitioner that she was a 14-year-old dependent living on Sheppard AFB. Despite expressing some initial concern that "Tina" was "young," "might get [him] in trouble," and might be trying to "set [him] up," Petitioner continued the conversation and expressed his eagerness to meet "Tina" in person. Petitioner's messages became increasingly sexually explicit, as he described various sexual acts he wanted to perform on "Tina." He also sent "Tina" a photo of his penis.

Petitioner arranged to meet "Tina" on the evening of 14 January 2015 at a house on Sheppard AFB where she was supposedly housesitting alone. After Petitioner's plan to borrow a car fell through, he walked across the base from his dormitory to the house. As Petitioner walked up the driveway of the house toward the front door, AFOSI agents emerged from the house and apprehended him.

In July 2015, SA TK was arrested for driving under the influence of alcohol (DUI). As a result, SA TK's Air Force superiors took certain adverse administrative actions.

At Petitioner's trial in November 2015, the Government introduced the testimony of SA TK, who explained the origin of the "Tina" operation at Sheppard AFB and his communications with Petitioner through the "Tina" persona. The Government also introduced the testimony of three other AFOSI agents involved in apprehending Petitioner and obtaining his electronic media devices, which contained his communications with "Tina." The Government introduced those electronic communications, including the penis photo and other images exchanged between Petitioner and "Tina." In response, the Defense contended that Petitioner had been entrapped, that he had no particular sexual interest in underage females, and that Petitioner never believed "Tina" to be a 14-year-old girl. Petitioner was convicted and sentenced as described above.

In April 2016, approximately five months after Petitioner's trial, SA TK testified in a court-martial at Ramstein Air Base (AB), Germany, *United States v. Smith*. *Smith* involved a "Tina" operation conducted at Ramstein AB, similar to but separate from the operation at Sheppard AFB at issue in Petitioner's trial. During the *Smith* trial, SA TK was cross-examined regarding the overarching operations plan that was submitted to AFOSI leadership to authorize "Tina"-type operations, known generally as "Operation Artemis." SA TK testified that he participated in creating the operations plan, which included as an attachment a checklist for undercover operations known as an "OSI Form 4." SA TK further testified that the Artemis plan required approval by a GS-15 civilian director and the general officer AFOSI commander. Then the following colloquy occurred:

Q. [Civilian Defense Counsel] [SA TK], please take a look at this document. This is the Artemis that we discussed with attachment one, the OSI Form 4, correct?

A. [SA TK] Yes, sir.

Q. This is the operational plan that was used and authorized, as you say, with regard to this [Ramstein AB] Tina operation, correct?

A. Yes, sir.

Q. There is no other are [sic] Artemis, no other operation plan approved by the general, correct?

A. No, sir.

Q. Because the general didn't approve the Tina operation, you would agree it's an unreliable investigation, correct?

A. Yes, sir.

Q. An unauthorized investigation? The general didn't approve the Tina investigation, correct?

A. Yes, sir.

Q. The very reliability of the case against Senior Airman Smith, in your mind, would be called into substantial question if this operation were not authorized, correct?

A. Yes, sir.

As SA TK's testimony continued, he acknowledged the checklist attached to the operations plan, the OSI Form 4, indicated that SA TK as the undercover agent would portray "a military husband with kids," a form of the operation known as "Plan A," but did not reference SA TK portraying an underage girl, known as "Plan B." However, SA TK clarified that the operations plan itself, as distinct from the attachment, authorized both Plan A and Plan B activities, and that the AFOSI commander had in fact "signed off on the ops plan." The OSI Form 4 was an administrative checklist merely to be used as a guide.

The cross-examination of SA TK in *Smith* later turned to a week-long training course SA TK had attended on conducting undercover operations such as the "Tina" operation. SA TK indicated that prior to *Smith* and to other trials based on "Tina" operations, trial counsel had asked SA TK whether he had a "training guide or syllabus" from that course and SA TK had informed them he did not. However, SA TK testified he did have a set of 86 "slides" from the course and had told trial counsel so, but SA TK's understanding was that

"slides" as distinct from a "training guide or syllabus" had never been requested. SA TK acknowledged the slides used during the first three days of the course do not specifically include examples of Plan B-type operations. However, he testified the "hands-on" portion of the course during the final two days did include specific training on Plan B scenarios. SA TK denied that the "Tina" operation he conducted at Ramstein AB at issue in *Smith* deviated from his training or from the Artemis operations plan that had been authorized.

## II. DISCUSSION

### A. Law

A petitioner may petition for a new trial "on the grounds of newly discovered evidence or fraud on the court." Article 73, UCMJ, 10 U.S.C. § 873. Petitions for a new trial do not proceed through the usual appellate process. *See id.*; *United States v. Brooks*, 49 M.J. 64, 68 (C.A.A.F. 1998). Instead, they are submitted to TJAG, who acts on the petition unless the case is pending before an appellate court, in which case he refers the petition to the appellate court where the case is pending. Rule for Courts-Martial (R.C.M.) 1210(a), (e).

A new trial shall not be granted on the grounds of newly discovered evidence unless the petition shows that:

> (A) The evidence was discovered after the trial;
>
> (B) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and
>
> (C) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.

R.C.M. 1210(f)(2); *see United States v. Luke*, 69 M.J. 309, 314 (C.A.A.F. 2011); *United States v. Johnson*, 61 M.J. 195, 198 (C.A.A.F. 2005).

"No fraud on the court-martial warrants a new trial unless it had a substantial contributing effect on a finding of guilty or the sentence adjudged." R.C.M. 1210(f)(3). Examples of fraud on a court-martial that may warrant granting a new trial include "confessed or proved perjury . . . which clearly had a substantial contributing effect on a finding of guilty" and "willful concealment by the prosecution from the defense of evidence favorable to the defense which . . . would probably have resulted in a finding of not guilty . . . ." R.C.M. 1210(f)(3), Discussion.

"[R]equests for a new trial . . . are generally disfavored," and are "granted only if a manifest injustice would result absent a new trial . . . based on proffered newly discovered evidence." *United States v. Hull*, 70 M.J. 145, 152

(C.A.A.F. 2011) (quoting *United States v. Williams*, 37 M.J. 352, 356 (C.M.A. 1993)).

## B. Analysis

Petitioner asserts he is entitled to a new trial on the basis of both newly discovered evidence and fraud on the court-martial.[2] Specifically, he points to three items of information the Government failed to disclose to the Defense before his trial: (1) the slides used during the week-long training course SA TK attended, which were not disclosed in response to the Defense's pretrial discovery requests for "training materials"; (2) the allegedly unauthorized nature of the "Tina" operations, as disclosed by SA TK's testimony in *Smith*; and (3) SA TK's arrest for driving under the influence of alcohol (DUI) on 31 July 2015 and the resulting adverse administrative actions taken by the Air Force. Petitioner contends that had this information been available to the Defense at Petitioner's trial, the Defense would have been able to demonstrate SA TK was not properly trained and the operation was not properly authorized, likely resulting in a full acquittal. We are not persuaded.

We considered related, although distinct, issues in *United States v. Dowd*, No. ACM 39073, 2017 CCA LEXIS 738, at *12–26 (A.F. Ct. Crim. App. 29 Nov. 2017) (unpub. op.). There, the appellant had been convicted of attempts to commit lewd acts on a child in the course of a "Tina" operation staged at Ramstein AB, also involving SA TK. *Id.* at *1–3. In *Dowd*, the appellant raised on appeal the issue of whether the Government violated his discovery rights by failing to disclose both the "unauthorized" nature of the "Tina" operation and the slides from SA TK's training course, as revealed through SA TK's testimony in *Smith*. In *Dowd*, we determined *inter alia* that even if we assumed *arguendo*[3] that the information should have been disclosed, the failure to disclose was harmless beyond a reasonable doubt. *Id.* at 26.

Petitioner's claims fail for similar reasons. Even if we accept for purposes of our analysis that the Defense discovered the information he now relies on only after trial[4] and that it would not have been discovered prior to trial by the

---

[2] Petitioner fails to identify any alleged, much less "confessed or proved," perjury at the court-martial. Accordingly, we interpret his invocation of fraud on the court-martial to imply the Government willfully concealed evidence favorable to the Defense that would have "probably" led to an acquittal. R.C.M. 1210(f)(3), Discussion.

[3] In fact, we found no discovery violation in *Dowd*. *Id.* at *22–24.

[4] Petitioner has submitted a declaration from his trial defense counsel identifying multiple discovery requests the Defense submitted to the Government before his trial. However, the declaration does not affirmatively assert the Defense failed to receive or was otherwise unaware before his trial of the information Petitioner now relies upon.

exercise of due diligence, it would not have "probably produce[d] a substantially more favorable result." R.C.M. 1210(f)(2). As in *Dowd*, disclosure of the training slides would not have significantly impacted the trial. The critical evidence was not SA TK's testimony per se but the Petitioner's communications with "Tina." SA TK's testimony was largely focused on explaining what the records of those exchanges were and how they came about. The Defense did not challenge the authenticity of those exhibits. Nothing in the proposed cross-examination of SA TK based on the training slides would have changed the advertisement Petitioner responded to, the messages he received from "Tina," the indecent language or image of his penis that Petitioner sent "Tina," or the fact that he was apprehended approaching the house where he had arranged to have sex with "Tina."

As for the "unauthorized" operation, the record of SA TK's testimony in *Smith* indicates it was not unauthorized as Petitioner attempts to portray. Petitioner emphasizes the portion of SA TK's testimony in *Smith* where SA TK appeared to agree that the AFOSI commanding general "didn't approve the Tina operation" and therefore "it's an unreliable investigation." As we noted in *Dowd*,

> This testimony is puzzling and difficult to square with SA TK's subsequent testimony in the same case that the AFOSI commander did authorize the Artemis operations plan . . . . It is possible SA TK was confused by the question; or believed the civilian defense counsel was presenting a hypothetical situation . . . . It is also possible SA TK simply misspoke, and subsequently clarified his testimony. In any event . . . we are not persuaded that SA TK believed the operation was unauthorized, [or] that the operation was in fact unauthorized . . . .

*Dowd*, 2017 CCA LEXIS 738, at *23–24. Ultimately, SA TK testified in *Smith* that the AFOSI commander had authorized the operations plan and the plan authorized "Tina"-type operations wherein SA TK portrayed an underage dependent child of a military member. Furthermore, as with the training slides, disclosure and cross-examination regarding the level at which the "Tina" operation had been approved would not have altered any of the essential facts or evidence in the case.

Finally, with respect to the adverse information related to SA TK's DUI arrest, Petitioner fails to articulate any theory of admissibility that would have permitted this information to come before the court members. Assuming *arguendo* it was introduced, we discern no prospect that it "probably" would have produced an acquittal or other substantially more favorable result. Again, it would not have affected the evidence forming the basis for Petitioner's convictions.

### III. CONCLUSION

The Petition for a New Trial is **DENIED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court